A jury in the Circuit Court of Shelby County convicted Timothy Scott Cothren of capital murder and the court sentenced him to death. In a unanimous decision, the Court of Criminal Appeals affirmed Cothren's conviction and sentence. SeeCothren v. State, 705 So.2d 849 (Ala.Crim.App. 1997), for a detailed statement of the pertinent facts. We affirm.
The Court of Criminal Appeals discussed six issues in its opinion. It is necessary for this Court to write to only one of those issues — whether the trial court erred in allowing Cothren's confession to be admitted into evidence.
Cothren contends that his confession to police officers, following his arrest in Louisiana, was obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and, therefore, that it should not have been introduced into evidence for consideration by the jury. Specifically, Cothren argues that immediately after he was arrested, when he was asked about the .25 caliber pistol that had been used to commit the murder, he made an unequivocal statement that he wanted an attorney, and he argues that he made it clear that he did not want to answer any further questions without the advice of an attorney. According to Cothren, the evidence indicates that one of the arresting officers, Capt. Murphy Meyers, understood his statement to be a request for an attorney and that Meyers asked no further questions after he made the statement. Cothren contends, however, that his statement was not relayed to the other investigating officers who later interrogated him. Cothren maintains that even though on several occasions he clearly indicated, both orally and in writing, a desire to waive hisMiranda rights and to speak with the investigating officers, that action on his part was ineffective as a matter of law because, he says, the investigating officers initiated a conversation with him after he had made an unequivocal statement that he did not want *Page 863 
to talk without an attorney being present. Cothren further contends that Capt. Meyers's testimony at the suppression hearing, with respect to the nature of Cothren's statement concerning an attorney, was inconsistent with Meyers's incident report and that Meyers changed his story in order to create an inference that Cothren's statement was not unequivocal. Capt. Meyers's incident report stated in part:
 "When asked what weapon Cothren stated the .25 cal. auto. Captain Meyers asked when he (Cothren) had possessed the weapon last and Cothren said he wanted to speak to his lawyer before answering that."
Meyers testified at the suppression hearing that Cothren had said, "I think I want to talk to an attorney before I answer that." Cothren contends that his confession was perhaps the most important aspect of the State's case and that its admission, if found to be erroneous, would not constitute harmless error.
The State contends (and the Court of Criminal Appeals held) that Cothren's statement to Meyers was not unequivocal. The State argues that the trial court correctly found that Capt. Meyers's testimony was not inconsistent with his incident report and that it indicates that Cothren stated in response to Meyers's specific question concerning when Cothren had last possessed the .25 caliber pistol that he thought he wanted an attorney before responding to that question. The State takes the position that Cothren later made his earlier intentions clear when he spoke with the investigating officers after clearly indicating, both orally and in writing, that he wished to waive his Miranda rights.
After carefully reviewing the record and the briefs, we conclude that Cothren's confession was properly admitted into evidence. In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981), the United States Supreme Court held that police officers must immediately cease interrogating a suspect who has clearly asserted his right to have an attorney present during custodial interrogation and that interrogation may not resume unless the suspect initiates and consents to further questioning. Later, in Davis v. United States,512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Court, addressing the question of how police officers should respond when a suspect makes a reference to an attorney that is insufficiently clear to invoke the Edwards prohibition on further questioning, stated:
 "The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, we have held, that it 'requir[es] the special protection of the knowing and intelligent waiver standard.' Edwards v. Arizona, 451 U.S., at 483 [101 S.Ct., at 1884]. See Oregon v. Bradshaw, 462 U.S. 1039, 1046-1047
[103 S.Ct. 2830, 2835, 77 L.Ed.2d 405] (1983) (plurality opinion); id., at 1051 [103 S.Ct., at 2838] (Powell, J., concurring in judgment). If the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him. North Carolina v. Butler, 441 U.S. 369, 372-376
[99 S.Ct. 1755, 1756-1759, 60 L.Ed.2d 286] (1979). But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. Edwards v. Arizona, supra, at 484-485 [101 S.Ct., at 1884-1885]. This 'second layer of prophylaxis for the Miranda right to counsel,' McNeil v. Wisconsin, 501 U.S. 171, 176 [111 S.Ct. 2204, 2208, 115 L.Ed.2d 158] (1991), is 'designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights,' Michigan v. Harvey, 494 U.S. 344, 350 [110 S.Ct. 1176, 1180, 108 L.Ed.2d 293] (1990). To that end, we have held that a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present. Minnick v. Mississippi, 498 U.S. 146 [111 S.Ct. 486, 112 L.Ed.2d 489] (1990); Arizona v. Roberson, 486 U.S. 675 [108 S.Ct. 2093, 100 L.Ed.2d 704] (1988). 'It remains clear, however, that this prohibition on further questioning — like other aspects of Miranda — is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose.' *Page 864 Connecticut v. Barrett, [479 U.S. 523, 528, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987)].
 "The applicability of the ' "rigid" prophylactic rule' of Edwards requires courts to 'determine whether the accused actually invoked his right to counsel.' Smith v. Illinois, [469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984)] (emphasis added), quoting Fare v. Michael C., 442 U.S. 707, 719 [99 S.Ct. 2560, 2569, 61 L.Ed.2d 197] (1979). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. See Connecticut v. Barrett, supra, 479 U.S., at 529
(107 S.Ct., at 832]. Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' McNeil v. Wisconsin, 501 U.S., at 178
[111 S.Ct., at 2209]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might
be invoking the right to counsel, our precedents do not require the cessation of questioning. See ibid.
('[T]he likelihood that a suspect would wish counsel to be present is not the test for applicability of Edwards'); Edwards v. Arizona, supra, at 485 [101 S.Ct., at 1885] (impermissible for authorities 'to reinterrogate an accused in custody if he has clearly asserted his right to counsel') (emphasis added).
 "Rather, the suspect must unambiguously request counsel. As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.' Smith v. Illinois, 469 U.S., at 97-98
[105 S.Ct., at 494] (brackets and internal quotation marks omitted). Although a suspect need not 'speak with the discrimination of an Oxford don,' post, at 476, 114 S.Ct., at 2364 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. See Moran v. Burbine, 475 U.S. 412, 433, n. 4 [106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410] (1986) ('[T]he interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney') (citations and internal quotation marks omitted).
 "We decline petitioner's invitation to extend Edwards and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. See Arizona v. Roberson, supra, at 688 [108 S.Ct., at 2101-2102] (Kennedy, J., dissenting) ('[T]he rule of Edwards is our rule, not a constitutional command; and it is our obligation to justify its expansion'). The rationale underlying Edwards is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity,' Michigan v. Mosley, 423 U.S. 96, 102 [96 S.Ct. 321, 326, 46 L.Ed.2d 313] (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in Edwards
requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer. In Miranda itself, we expressly rejected the suggestion 'that each police station must have a "station house lawyer" present at all times to advise prisoners,' 384 U.S., at 474
[86 S.Ct., at 1628], and held instead that a suspect must be told of his right to have an attorney present and that he may not be questioned after invoking his right to counsel. We also noted that if a suspect is 'indecisive in his request for counsel,' the officers need not always cease questioning. See id., at 485 [86 S.Ct., at 1633].
 "We recognize that requiring a clear assertion of the right to counsel might disadvantage *Page 865 
some suspects who — because of fear, intimidation, lack of linguistic skills, or a variety of other reasons — will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.' Moran v. Burbine, supra, at 427 [106 S.Ct., at 1144]. A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although Edwards
provides an additional protection — if a suspect subsequently requests an attorney, questioning must cease — it is one that must be affirmatively invoked by the suspect.
 "In considering how a suspect must invoke the right to counsel, we must consider the other side of the Miranda equation: the need for effective law enforcement. Although the courts ensure compliance with the Miranda requirements through the exclusionary rule, it is police officers who must actually decide whether or not they can question a suspect. The Edwards rule — questioning must cease if the suspect asks for a lawyer — provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that might
be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he hasn't said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney."
512 U.S. at 458-61, 114 S.Ct. at 2354-56.
Capt. Meyers testified at the suppression hearing as follows:
 "Q. Is it the policy of your parish that after a suspect has indicated he wishes to talk to counsel that y'all continue to interrogate him?
"A. Not at all. That's a violation of the law.
 "Q. Weren't you aware at this particular time that he had told you he wished to talk to an attorney?
 "A. He did not without a doubt tell me that he wanted to obtain counsel. The man told me he thought he would like to speak to an attorney before he answered that one question. In my estimation, that's not a request for counsel.
 "Q. And the reason you continued to take him to the parish office for him to be interrogated was because you formed the opinion that that was not a request for an attorney; is that correct?
 "A. Under the circumstances and the context of the questioning, the location where we were at, that's correct. It was not a firm request for counsel.
 "Q. And that's the reason you continued to place him in the position of being interrogated?
"A. That's correct.
". . . .
 "Q. And it's my understanding that had you considered that he unequivocally had said he wanted to talk to an attorney, then of course you would have sent him directly to the correction facility?
 "A. No, sir. I still would have sent him to the parish jail but I would have accompanied him and I would have informed Capt. DeRouen personally that the man has invoked his right to an attorney.
 "Q. But you did file a written report that indicated exactly what you have told us today?
 "A. The report I filed is — if we are speaking directly of the conversation between myself and Cothren, I filed the report, yes, sir, but it's a paraphrase of our conversation. As a habit, I generally will not put quotes in my police reports." *Page 866 
We agree with the State that the trial court could have reasonably concluded from Capt. Meyers's testimony that Cothren stated, just after his arrest, "I think I want to talk to an attorney before I answer that." Meyers's credibility was a matter for the trial court to resolve. Therefore, the dispositive issue is whether that statement, under the circumstances, was sufficiently clear to Capt. Meyers to invoke the Edwards prohibition on further questioning.
In Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994), cert. denied, 514 U.S. 1086, 115 S.Ct. 1801, 131 L.Ed.2d 727
(1995), the Eleventh Circuit Court of Appeals, addressing a similar issue, set out the general dictionary definitions of "equivocal," as that word was used in Davis:
 "[Equivocal] is defined as: 'Having different significations equally appropriate or plausible; capable of double interpretation; ambiguous,' 5 Oxford English Dictionary 359 (2d ed., J.A. Simpson E.S.C. Weiner, eds., 1989); and as: 'Having two or more significations; capable of more than one interpretation; of doubtful meaning; ambiguous,' Webster's Third International Unabridged Dictionary
769 (1986)."
30 F.3d at 1425. Based on our review of the record, we conclude that Cothren's statement to Meyers is capable of equally plausible, differing interpretations and, therefore, that it is equivocal. The record indicates that Cothren had been fully apprised of his Miranda rights and that he was responding to Capt. Meyers's questions just before Meyers asked him when he had last possessed the .25 caliber pistol that had been used to commit the murder. In response to that particular question, Cothren stated, "I think I want to talk to an attorney before I answer that." It is, of course, impossible for us to glean from a cold record the intonations of Cothren's voice as he made the statement. Capt. Meyers testified that Cothren made the statement in a "normal voice." However, Meyers also testified that he did not understand Cothren's statement to be a blanket refusal to speak further to the police without the presence of an attorney. Without being privy to the manner in which Cothren made the statement, i.e., without knowing whether Cothren had an equivocal tone in his voice, we find two aspects of the statement that suggest to us that Capt. Meyers could reasonably have believed that Cothren was willing to talk further without the assistance of an attorney. First, Cothren stated, "I think
I want to talk to an attorney . . . ." Although the word "think," in and of itself, is of sufficiently clear import, its use here tends to diminish the forcefulness of the statement. In this respect, we agree with the conclusion reached by the Arizona Supreme Court in State v. Eastlack, 180 Ariz. 243,883 P.2d 999 (Ariz. 1994), cert. denied, 514 U.S. 1118,115 S.Ct. 1978, 131 L.Ed.2d 866 (1995). In that case, the court concluded that the statement "I think I better talk to a lawyer first" was not an unequivocal request for an attorney. Cothren's use of the word "think" could have led Capt. Meyers to conclude that Cothren was not certain as to what he should do. Second, Cothren stated, "I think I want to talk to an attorney before I answer that." Capt. Meyers could have reasonably concluded from Cothren's use of the word "that" that Cothren was hesitant to respond to the specific question asked about the .25 caliber pistol, but that he might be willing to submit to other questions at a later time. The Davis Court made it very clear that it was unwilling to adopt a rule that would force police officers in "the real world of investigation and interrogation," 512 U.S. at 461, 114 S.Ct. at 2356, to make difficult judgment calls about whether a suspect in fact wants an attorney before speaking to the police. The Court succinctly noted that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." 512 U.S. at 459,114 S.Ct. at 2355. (Emphasis original.) We recognize that reasonable judges and attorneys may have differing opinions as to what Cothren actually meant by his statement. However, as we read Davis, the proper standard to be used in resolving this issue is an objective one — whether a police officer in the field reasonably could have concluded from the circumstances that a suspect was not absolutely *Page 867 
refusing to talk without the assistance of an attorney.
Although it does not form the primary basis for our holding with respect to the admissibility of Cothren's confession, we also conclude, based on our review of the record, that even if Cothren's statement to Capt. Meyers were to be construed to be unequivocal as a matter of law, there was credible evidence supporting the admission of Cothren's confession. Nathan DeRouen, the chief criminal investigator for the Iberia Parish, Louisiana, Sheriffs Department, testified as follows with regard to his initial conversation with Cothren after Cothren and the other suspects had been transported to police headquarters:
 "Q. All right. And having relayed this information to Detective Calvanese, what did you next do?
 "A. The first guy I talked to after that, after Detective Calvanese, was Tracey West. I wanted to make sure he was comfortable, asked him if he understood why he was being detained. He advised yes. And if he needed anything, just ask, you know. And the next person I talked to was Mr. Cothren.
 "Q. Okay. And what, if anything, did you say to Mr. Cothren?
 "A. Again I explained to Mr. Cothren why he was being detained and that he was under arrest for illegal possession of a stolen vehicle from Pulaski, Tennessee, and that he was also going to be questioned in reference to the armed robbery/homicide in Mississippi and an armed robbery/homicide in . . . Alabama. He said he understood. And I asked him if he was willing to talk to detectives from these agencies and he said, 'Yeah, no problem.'"
(Emphasis added.) Neither DeRouen, nor any of the other investigators involved in the investigation of the Alabama and Mississippi murders, was aware that Cothren had previously made the statement to Capt. Meyers indicating that he thought he wanted an attorney before answering a particular question. The trial court could have found that Cothren was not mistreated by the investigating officers and that he willingly (after being advised of his Miranda rights a number of times) gave incriminating statements concerning his involvement in both the Alabama murder and the Mississippi murder.
The Supreme Court set out the facts in Edwards, as follows:
 "On January 19, 1976, a sworn complaint was filed against Edwards in Arizona state court charging him with robbery, burglary, and first-degree murder. An arrest warrant was issued pursuant to the complaint, and Edwards was arrested at his home later that same day. At the police station, he was informed of his rights [under Miranda]. Petitioner stated that he understood his rights, and was willing to submit to questioning. After being told that another suspect already in custody had implicated him in the crime, Edwards denied involvement and gave a taped statement presenting an alibi defense. He then sought to 'make a deal.' The interrogating officer told him that he wanted a statement, but that he did not have the authority to negotiate a deal. The officer provided Edwards with the telephone number of a county attorney. Petitioner made the call, but hung up after a few moments. Edwards then said: 'I want an attorney before making a deal.' At that point, questioning ceased and Edwards was taken to county jail.
 "At 9:15 the next morning, two detectives, colleagues of the officer who had interrogated Edwards the previous night, came to the jail and asked to see Edwards. When the detention officer informed Edwards that the detectives wished to speak with him, he replied that he did not want to talk to anyone. The guard told him that 'he had' to talk and then took him to meet with the detectives. The officers identified themselves, stated they wanted to talk to him, and informed him of his Miranda rights. Edwards was willing to talk, but he first wanted to hear the taped statement of the alleged accomplice who had implicated him. After listening to the tape for several minutes, petitioner said that he would make a statement so long as it was not tape-recorded. The detectives informed him that the recording was irrelevant *Page 868 
since they could testify in court concerning whatever he said. Edwards replied: 'I'll tell you anything you want to know, but I don't want it on tape.' He thereupon implicated himself in the crime.
451 U.S. at 478-79, 101 S.Ct. at 1881-82.
Holding that Edwards had not effectively waived his right to counsel, the Court, citing a number of cases, includingJohnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461
(1938), noted that "[i]t is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " 451 U.S. at 482,101 S.Ct. at 1884, quoting Johnson v. Zerbst, 304 U.S. at 464,58 S.Ct. at 1023. The Court then went on to state:
 "[A]lthough we have held that after initially being advised of his Miranda rights, the accused may himself validly waive his rights and respond to interrogation, see North Carolina v. Butler, [441 U.S. 369, 372-376, 99 S.Ct. 1755, 1756-1759, 60 L.Ed.2d 286 (1979)], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
 "Miranda itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.' 384 U.S., at 474 [86 S.Ct., at 1628]. Our later cases have not abandoned that view. In Michigan v. Mosley, 423 U.S. 96 [96 S.Ct. 321, 46 L.Ed.2d 313] (1975), the Court noted that Miranda
had distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and had required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel. 423 U.S., at 104, n. 10 [96 S.Ct., at 326, n. 10]; see also id., at 109-111 [96 S.Ct., at 329-330] (White, J., concurring). In Fare v. Michael C., supra, at 719 [99 S.Ct., at 2569], the Court referred to Miranda's 'rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment lights, requiring that all interrogation cease.' And just last Term, in a case where a suspect in custody had invoked his Miranda right to counsel, the Court again referred to the 'undisputed right' under Miranda to remain silent and to be free of interrogation 'until he had consulted with a lawyer.' Rhode Island v. Innis, 446 U.S. 291, 298 [100 S.Ct. 1682, 1688, 64 L.Ed.2d 297] (1980). We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.
 "In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in Miranda is the light to have counsel present at any custodial interrogation. Absent such interrogation, there would have been *Page 869 
no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver. Rhode Island v. Innis, supra, makes this sufficiently clear. 446 U.S., at 298, n. 2 [100 S.Ct., at 1688, n. 2].*
 "But this is not what the facts of this case show. Here, the officers conducting the interrogation on the evening of January 19 ceased interrogation when Edwards requested counsel as he had been advised he had the right to do. The Arizona Supreme Court was of the opinion that this was a sufficient invocation of his Miranda rights, and we are in accord. It is also clear that without making counsel available to Edwards, the police returned to him the next day. This was not at his suggestion or request. Indeed, Edwards informed the detention officer that he did not want to talk to anyone. At the meeting, the detectives told Edwards that they wanted to talk to him and again advised him of his Miranda rights. Edwards stated that he would talk, but what prompted this action does not appear. He listened at his own request to part of the taped statement made by one of his alleged accomplices and then made an incriminating statement, which was used against him at his trial. We think it is clear that Edwards was subjected to custodial interrogation on January 20 within the meaning of Rhode Island v. Innis, supra, and that this occurred at the instance of the authorities. His statement made without having had access to counsel, did not amount to a valid waiver and hence was inadmissible.
451 U.S. at 484-87, 101 S.Ct. at 1885-86.
The United States Supreme Court has indicated thatEdwards established a "bright-line" rule that prevents the police from "approaching" a suspect for further "interrogation" after the suspect has clearly requested the assistance of an attorney. See McNeil v. Wisconsin, 501 U.S. 171,111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); Michigan v. Jackson,475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); Solem v. Stumes,465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984); Smith v.Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). However, we do not read Edwards and its progeny as establishing a rigid "per se rule, requiring a threshold inquiry as to precisely who opened any conversation between an accused and state officials." Edwards, 451 U.S. at 489-90,101 S.Ct. at 1887 (Chief Justice Burger, concurring in the judgment) (emphasis added). In determining whether there has been a knowing and intelligent relinquishment of the right not to speak without an attorney being present, the Edwards Court explained that the focus should be on the totality of the circumstances, specifically on whether the suspect was subjected against his will to police-initiated interrogation.
Although the Court appears to have abandoned the Johnson v.Zerbst "totality of the circumstances" test for determining the voluntariness of a waiver of the right to an attorney in theEdwards context, see, e.g., Solem v. Stumes, supra, we are not convinced that Edwards rendered totally irrelevant the circumstances surrounding a police officer's conversation with an accused, such as the conversation initiated by investigator DeRouen in the present case. In Edwards, the defendant Edwards was clearly requestioned under coercive circumstances incompatible with a voluntary waiver of his right to an attorney. However, the circumstances surrounding Cothren's confession are not remotely similar to those in Edwards. Here, investigator DeRouen, who had no knowledge that Cothren had made a statement to Capt. Meyers concerning an attorney, merely asked Cothren if he wished to talk with investigators from Mississippi and Alabama. We do not view DeRouen's routine inquiry in this regard as police-initiated interrogation, within the meaning of Edwards or Rhode Island v. Innis,446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980): *Page 870 
 "We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."
446 U.S. at 300-01, 100 S.Ct. at 1689-90. True, Cothren himself did not initiate the conversation with investigator DeRouen; however, Cothren clearly wanted to talk (as is evidenced by the videotape and the audiotapes contained in the record), and it was Cothren who readily consented to, and, thus, invited further interrogation by the Mississippi and Alabama investigators. The Court in Davis noted that the Edwards rule was " 'designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights.' "512 U.S. at 458, 114 S.Ct. at 2355, quoting Michigan v. Harvey,494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). The Davis Court also noted that the Edwards rule was not a constitutional command and that it was not inclined to extendEdwards beyond its specific holding.
In the present case, the trial court could have found that investigator DeRouen, with no knowledge that Cothren had stated to Capt. Meyers that he thought he wanted to speak with an attorney, fully informed Cothren of his Miranda rights and then merely asked him if he wished to relinquish those rights and speak with investigators from Mississippi and Alabama. Cothren responded, "Yeah. No problem." The trial court could also have found that Cothren was never mistreated by the investigating officers or "badgered" into giving a confession. We fear that reading Edwards as broadly as Cothren suggests " 'would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity,' "512 U.S. at 460, 114 S.Ct. at 2356, quoting Michigan v. Mosley,423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). This we will not do, in the absence of a clarifying opinion from the United States Supreme Court stating that Cothren's confession was inadmissible under the circumstances here presented.
Based on the above, we agree with the Court of Criminal Appeals that Cothren's confession was admissible. However, we do not agree with the Court of Criminal Appeals that if the admission of the confession had been error the error could be held to be harmless. Cothren's confession was the centerpiece of the State's case and it was extremely prejudicial to Cothren. Therefore, its erroneous admission would have adversely affected Cothren's right to a fair trial. Rule 45, Ala.R.App.P.
Cothren has also raised here a number of issues that were not addressed by the Court of Criminal Appeals. Although we have considered all of those issues, we find it necessary to address only one of them — whether during the sentencing phase of the trial the court erred in instructing the jury with respect to weighing the aggravating and mitigating circumstances.
Cothren contends that the following portion of the trial court's instructions constituted reversible error:
 "[T]he law also provides whether death or life imprisonment without parole should be imposed upon the defendant depends upon whether any aggravating circumstances exist and whether any circumstances exist — any mitigating circumstances exist that outweigh those aggravating circumstances."
Cothren correctly argues that Alabama law requires that the jury find the aggravating circumstances to outweigh the mitigating circumstances before it can recommend a death sentence. However, according to Cothren, that portion of the trial court's instructions set out above created an impermissible presumption in favor of a death sentence, a presumption that, he says, he had to attempt to overcome. The State contends that the trial court's instructions, taken as a whole, sufficiently informed the jury that it had to weigh the aggravating and mitigating circumstances and that it had to find that the aggravating circumstances outweighed the *Page 871 
mitigating circumstances before it could recommend a death sentence.
After reviewing the trial court's instructions, we hold that those instructions, taken as a whole, sufficiently informed the jury of the weighing process required under the law. We specifically reject Cothren's contention that the trial court created a presumption in favor of a death sentence by informing the jury that they could consider whether "any mitigating circumstances exist that outweigh those aggravating circumstances." See Ala. Code 1975, § 13A-5-46, which provides in part as follows:
 "(d) After hearing the evidence and the arguments of both parties at the sentence hearing, the jury shall be instructed on its function and on the relevant law by the trial judge. The jury shall then retire to deliberate concerning the advisory verdict it is to return.
 "(e) After deliberation, the jury shall return an advisory verdict as follows:
". . . .
 "(2) If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist but do not outweigh the mitigating circumstances, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole;
 "(3) If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death."
Alabama law requires a weighing process. If the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it must recommend a death sentence. If the jury finds that the mitigating circumstances outweigh the aggravating circumstances, it must recommend a sentence of life imprisonment without parole. The trial court's instructions did not create a presumption in favor of a verdict recommending a death sentence.
We have fully considered each of the issues raised by Cothren. Furthermore, we have independently searched the record for error. Having carefully read and considered the record, together with the briefs of counsel, we can find no reversible error in the proceedings below. The judgment of the Court of Criminal Appeals is due to be affirmed.
AFFIRMED.
HOOPER, C.J., and SHORES and SEE, JJ., concur.
BUTTS, J., concurs in the result.
* "If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities."