BURKE, Judge.
Darryl David Thompson appeals his conviction for manslaughter, see § 13A-6-3, Ala.Code 1975, and his resulting sentence of 15 years in prison. We affirm.
In September 2009, Thompson was indicted for murder. On August 3, 2010, Thompson filed a motion to suppress recorded statements that he made to law-enforcement officers shortly after midnight on February 17, 2009. Thompson argued that he was in custody when he made the statements and that the officers continued to interrogate him after he had asserted his right to counsel. On December 1, 2010, the State filed a response to Thompson’s motion to suppress, arguing that, *803 during the questioning that occurred on February 17, 2009, Thompson was not in custody and did not invoke his right to counsel. After conducting a hearing, the trial court denied Thompson’s motion to suppress on December 7, 2010.
At trial, the State’s evidence indicated the following. On February 16, 2009, at approximately 10:00 p.m., Melissa Garrett suffered a fatal gunshot wound to the neck while at her house. Thompson and Garrett’s 12-year-old daughter were at the house when the incident occurred.
Thompson had been staying with Garrett for about a week before her death, and he and Garrett had been drinking and using drugs during that time. On the day of Garrett’s death, she and Thompson had been drinking and using drugs at her house all day. The daughter, who had been staying with a friend for about a week, arrived at her mother’s house at approximately 6:00 p.m. on the day of the incident. When she arrived home, she went to her bedroom.
Later that evening, her daughter went into Garrett’s bathroom, and she could hear Garrett and Thompson arguing in the living room. The daughter then returned to her room, where she could hear the argument escalating. The daughter then confronted Garrett and Thompson and told them that “they needed to keep it down or someone would call the cops.” (R. 315-16.) She then retrieved dirty clothes from her room and took them into the laundry room so that she could wash them.
While in the laundry room, the daughter could clearly hear Garrett and Thompson arguing. The daughter testified that she heard Garrett say that Thompson had broken her phone. The daughter also heard Garrett tell Thompson to give her gun back to her. According to the daughter, Thompson responded: “So what, you are going to shoot me now?” (R. 820.) Then Garrett replied: “How am I supposed to shoot you? You have my gun.” (R. 320.) A short time after that exchange, the daughter heard the gun fire. After the gunshot, the daughter “froze,” and one or two minutes of complete silence passed before Thompson came to the laundry room and told her that he needed to use her phone because, he said, Garrett had shot herself. (R. 321.) The daughter ran into the living room and saw Garrett lying on the couch. The daughter wanted to call emergency 911, but Thompson instructed her to call Kathy, a family friend, first because “there were drugs everywhere.” (R. 325.) After calling Kathy, the daughter called 911. After she spoke briefly with the 911 operator, the operator asked to speak to Thompson. Shortly thereafter, Kathy, law-enforcement officers, and emergency-medical personnel arrived at the house.
After the law-enforcement officers and emergency-medical personnel arrived at Garrett’s house, Thompson was asked to go outside so that the emergency personnel could do their jobs. Thompson initially complied with the request to go outside, but he repeatedly tried to reenter the house. Because Thompson repeatedly tried to reenter the house, law-enforcement officers placed him in the back of a patrol car and did not allow him to get out of the car; however, he was not handcuffed or placed under arrest.
After being in the back of the patrol car for approximately one hour, Thompson was taken to the police department and interviewed by Travis Clemons, the chief investigator for the Lauderdale County Sheriffs Office. That interview was recorded and presented at trial. Thompson objected to the admission of the interview at trial. As he did in his motion to suppress, Thompson argued that he was in custody and that the officers continued to *804 interrogate him after he had asserted his right to counsel.
At the beginning of the interview, Thompson stated: “Okay. I have nothing to hide. I’m not, I’m not wrong (unintelligible) nothing. You know what I’m saying? I guess I got to call an attorney if I needed one, right? Is this the time now when I need to?” Investigator Clemons responded: “No, I’ll let you know right here in just a second.” Thompson replied: “Okay, no problem.” After obtaining some biographical information from Thompson and before asking him any questions concerning Garrett’s death, Investigator Clemons read Thompson his Miranda[1] warnings.[2] Thompson orally acknowledged that he understood his rights, and he signed a form that listed those rights and that stated that he understood and waived those rights, including his right to an attorney. Investigator Clemons also informed Thompson that he was not under arrest. At one point during the interview, Thompson asked to telephone his mother so that he could let her know what was happening, and he stated that “if she thinks I need an attorney, she will call an attorney.” Thompson was immediately allowed to call his mother, and he told her that “I don’t know if, uh, I need a lawyer or not.” After the telephone conversation with his mother ended, the interview resumed and nothing else was said about an attorney. After the interview ended, Thompson was allowed to leave.
During the interview, Thompson described how he was sitting upright immediately to Garrett’s left on the couch as they argued and as she waived the gun around in her right hand. Thompson stated that he knew that Garrett had chambered a round in the gun. Thompson stated that he grabbed Garrett’s arm in an effort to take the gun away from her, but she pulled away from him and the gun immediately fíred a bullet into her neck. During the interview, Thompson demonstrated the relative positions of Garrett and himself while they were on the couch, and he demonstrated how she pulled away from him and shot herself.
At trial, Investigator Clemons testified that he examined the couch from Garrett’s house, and he determined that the bullet that fatally wounded Garrett traveled through the right armrest of the couch and into the back, bottom-right portion of the couch, where it was found. Investigator Clemons further testified that the trajectory of the bullet was wholly inconsistent with Thompson’s description of how Garrett was shot. Also, Investigator Clemons found a broken necklace and a broken cell phone near the couch.
Valerie Green, the forensic pathologist who performed the autopsy on Garrett, testified that Garrett died from a gunshot wound to the right side of her neck. Green determined that the gunshot wound occurred from a very close range and that the gun was held at an angle to Garrett’s neck at the time the gun was fired. The entrance wound was just below Garrett’s right ear and slightly behind the ear. Green testified that, based on the soot deposition on Garrett’s skin from the gunshot and the searing and tearing of Garrett’s skin, the gun had to be actually placed against Garrett’s skin and held at a particular angle when it was fired. The exit wound was at the back-bottom portion *805 of Garrett’s scalp. According to the autopsy report, the direction of the gunshot wound was right to left, front to back, and upward.
Green also testified that Garrett had pattern bruising and abrasions on her arms and hands. Garrett also had bruises and abrasions around her cheek and eye. Green described the bruising as “fresh.” Green testified that there was also a laceration on Garrett’s lip. Green further testified that those injuries were not related to the gunshot wound and that those injuries were consistent with a recent physical altercation.
Based on her autopsy findings, Green determined that Garrett’s death was a homicide. Green determined that Garrett’s death could not have occurred in the way Thompson described.
At the close of the State’s case, Thompson made a motion for a judgment of acquittal, arguing that the State had not presented a prima facie case of murder. The trial court denied that motion.
Thompson testified in his own defense at trial. Thompson testified concerning Garrett’s depression at the time of her death. In June 2008, Garrett was terminated from her employment as a Licensed Practical Nurse (“LPN”) at a convalescent center because she reported to work under the influence of alcohol. Because of that incident, in December 2008, Garrett entered into a consent order with the Alabama Board of Nursing that placed her LPN license on probation for 12 months. Thompson, who had known Garrett for about seven years, testified that after Garrett was terminated from her employment and placed on probation, she was more depressed and her drug use increased.
Thompson testified that, on the day of Garrett’s death, he and Garrett had been drinking alcohol and smoking cocaine. At some point Garrett passed out, and she woke up later that evening. According to Thompson, after Garrett woke up, she wanted to go to Florence to buy more drugs. Thompson testified that he and Garrett argued because he told her that he did not want to go to Florence. According to Thompson, Garrett responded to his refusal to go to Florence by stating: “Okay, give me my gun.” (R. 729.) Thompson testified that the gun was on the coffee table in front of the couch. Thompson knew that the gun was loaded. Thompson further testified that Garrett picked up the gun and began waiving it around in her right hand. Thompson admitted to making the statement: “So you are going to shoot me now?” However, Thompson denied that Garrett said: “How am I supposed to shoot you? You have my gun.” Instead, Thompson testified that Garrett said: “I’m fixing to end it. I’m fixing to end this.” (R. 735.)
Thompson testified that, during the argument, he was sitting in the middle of the couch and Garrett was sitting on the right side of the couch. Thompson stated that he and Garrett were sitting in an upright position on the front of the couch. According to Thompson, he tried to take the gun away from Garrett by grabbing her right arm; however, she pulled away from him and, as she did, she fell back and shot herself in the neck. Thompson denied shooting the gun or having it in his hand. Thompson also denied having had a physical altercation with Garrett, and he denied causing the laceration on Garrett’s lip or the bruises and abrasions that were on her arms and face.
At the close of all the evidence, Thompson renewed his motion for a judgment of acquittal, arguing that the State had not presented a prima facie case of murder. The trial court denied that motion.
*806 Before deliberations, the trial court instructed the jury on murder and on the lesser-included offenses of manslaughter and criminally negligent homicide. On December 9, 2010, the jury found Thompson guilty of manslaughter. On February 16, 2011, the trial court sentenced Thompson to 15 years in prison. On February 22, 2011, Thompson filed a motion for a new trial, arguing that the jury’s verdict was against the great weight of the evidence. On March 25, 2011, the trial court denied Thompson’s motion for a new trial. Thompson appealed to this Court.
On appeal, Thompson first alleges that the trial court erred by denying his motion to suppress the recorded statements he made to law-enforcement officers during his interview on February 17, 2009. Thompson alleges that he was in custody when he made the statements and that the officers continued to interrogate him after he had unequivocally asserted his right to counsel. Thompson alleges that he unequivocally invoked his right to counsel at the beginning of the interview when he stated: “Okay. I have nothing to hide. I’m not, I’m not wrong (unintelligible) nothing. You know what I’m saying? I guess I got to call an attorney if I needed one, right? Is this the time now when I need to?” That statement was made before Thompson waived his Miranda rights. As our Supreme Court has stated:
“The Fifth Amendment to the United States Constitution provides that ‘[n]o person ... shall be compelled in any criminal case to be a witness against himself.’ U.S. Const. Amend. V. In Miranda, the United States Supreme Court held that the right against self-incrimination ‘is fully applicable during a period of custodial interrogation.’ 384 U.S. at 460. The Supreme Court in Miranda further held that ‘the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege.... ’ 384 U.S. at 469. Before a custodial interrogation, a suspect must be informed of these rights, now commonly referred to as Miranda rights. 384 U.S. at 444 (‘Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.’). The Supreme Court in Miranda recognized that ‘the defendant may waive effectuation of these rights, provided that the waiver is made voluntarily, knowingly, and intelligently.’ Id.”
Ex parte Landrum, 57 So.3d 77, 81 (Ala.2010).
During a custodial interrogation, if the suspect unequivocally requests counsel at any time before or after the suspect waives his Miranda rights, “the interrogation must cease until an attorney is present.” Miranda, 384 U.S. at 474. If the suspect makes an equivocal reference to an attorney after waiving his Miranda rights, the interrogating officer has no obligation to stop questioning the suspect and the officer is not required to ask questions to clarify whether the suspect actually wants an attorney. Davis v. United States, 512 U.S. 452, 459-62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). However, if a suspect makes an equivocal reference to an attorney before waiving his Miranda rights, the interrogating officer is required to ask questions to clarify the reference until the suspect either clearly invokes his right to counsel or waives it. See State v. Collins, 937 So.2d 86, 93 (Ala.Crim.App.2005) (holding that “[bjeeause [the defendant] did not waive her Miranda rights before she asked the questions about obtaining a lawyer, the ambiguity of her questions re *807 quired the interrogating officer to ask follow-up questions to clarify the ambiguity”).
In the present case, Thompson’s reference to an attorney was made before he waived his Miranda rights. Thus, any of Thompson’s statements made subsequent to the reference to an attorney must be suppressed if (1) the reference was an unequivocal invocation of his right to counsel or (2) he made an equivocal reference to counsel but Investigator Clemons did not ask questions to clarify the reference before obtaining Thompson’s signature on the Miranda waiver form and asking him questions concerning Garrett’s death.
In determining whether a suspect’s statement was an unequivocal invocation of his right to counsel, we are guided by the following principles:
“ ‘The applicability of the “ ‘rigid’ prophylactic rule” of Edwards[ v. Arizona, 451 U.S. 477, 101 S.Ct. 1880 (1981)] requires courts to “determine whether the accused actually invoked his right to counsel.” Smith v. Illinois, [469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984)] (emphasis added), quoting Fare v. Michael C., 442 U.S. 707, 719 [99 S.Ct. 2560, 2569, 61 L.Ed.2d 197] (1979). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. See Connecticut v. Barrett, supra, 479 U.S. [523], at 529 [107 S.Ct. [828] at 832 (1987) ]. Invocation of the Miranda right to counsel “requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.” McNeil v. Wisconsin, 501 U.S. [171] at 178 [111 S.Ct. [2204] at 2209 (1991)].
“ ‘... As we have observed, “a statement either is such an assertion of the right to counsel or it is not.” Smith v. Illinois, 469 U.S., at 97-98 [105 S.Ct., at 494] (brackets and internal quotation marks omitted). Although a suspect need not “speak with the discrimination of an Oxford don,” post, at 476, 114 S.Ct., at 2364 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.’ ”
Ex parte Cothren, 705 So.2d 861, 864 (Ala.1997) (quoting Davis, 512 U.S. at 458-59).
Furthermore, a suspect’s reference to an attorney is equivocal if “ ‘a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel.’ ” Cothren, 705 So.2d at 864 (quoting Davis, 512 U.S. at 459). “[T]he proper standard to be used in resolving this issue is an objective one — whether a police officer in the field reasonably could have concluded from the circumstances that a suspect was not absolutely refusing to talk without the assistance of an attorney.” Cothren, 705 So.2d at 866-67.
Equivocal has been defined as:
“ ‘ “Having different significations equally appropriate or plausible; capable of double interpretation; ambiguous,” 5 Oxford English Dictionary 359 (2d ed., J.A. Simpson & E.S.C. Weiner, eds., 1989); and as: “Having two or more significations; capable of more than one interpretation; of doubtful meaning; ambiguous,” Webster’s Third International Unabridged Dictionary 769 (1986).’ ”
*808 Cothren, 705 So.2d at 866 (quoting Coleman v. Singletary, 30 F.3d 1420, 1425 (11th Cir.1994)).
In the present case, Thompson stated: “I guess I got to call an attorney if I needed one, right? Is this the time now when I need to?” First, that statement is clearly making an inquiry and is not positively declaring anything. Second, Thompson stated, “I guess I got to call an attorney....” Thompson’s use of the word “guess” could have reasonably led Investigator Clemons to conclude that Thompson was not certain whether he wished to answer questions without the presence of an attorney. See Cothren, 705 So.2d at 866 (holding that the phrase “I think I want to talk to an attorney” was not an unequivocal request for an attorney because the “use of the word ‘think’ could have led [the interrogating officer] to conclude that [the suspect] was not certain as to what he should do”). Finally, Thompson stated, “I guess I got to call an attorney if I needed one.... ” Thompson’s use of the phrase “if I needed one” lacks any indication of an absolute present desire to consult with an attorney. Instead, that phrase indicates that Thompson might desire counsel if he determines that he needs counsel. See Henry v. State, 265 Ga. 732, 735-36, 462 S.E.2d 737, 743 (1995) (holding that the suspect’s statement “ T might need one. If I need one,’ was at best an ambiguous and equivocal statement regarding his desire to assert his right to counsel”). Based on the objective standard set forth in Davis and Cothren, a reasonable officer in Investigator Clemons’s position would have understood only that Thompson might desire to invoke his right to counsel if he deemed that he needed counsel. Investigator Clemons could not have reasonably concluded from the circumstances that Thompson was absolutely refusing to talk without the assistance of an attorney. Therefore, Thompson’s reference to an attorney was, at best, an equivocal assertion regarding his right to counsel.
Considering that Thompson’s pre-waiver reference to an attorney was, at best, an equivocal assertion regarding his right to counsel, the second half of our inquiry is whether Investigator Clemons fulfilled his duty to ask questions to clarify Thompson’s reference to an attorney before obtaining his signature on the Miranda waiver form and asking him questions concerning Garrett’s death.
Initially, we note that Thompson does not specifically argue that, to the extent his reference to an attorney was equivocal, Investigator Clemons did not fulfill his duty to further clarify the meaning of the reference before proceeding with the interrogation. Thompson contends only that he “made a clear and unequivocal request for counsel.” (Thompson’s brief, at 25-26.) Therefore, this issue is not properly presented to this Court for review. See Rule 28(a)(10), Ala. R.App. P. (providing that the brief of an appellant shall contain “an argument containing the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on”); see also Woods v. Federated Mut. Ins. Co., 31 So.3d 701 (Ala.Civ.App.2009) (holding that “[fit is not the duty of the appellate court to make arguments for the parties, nor is it the appellate court’s duty to conduct the parties’ legal research”).
In any event, we conclude that Investigator Clemons fulfilled his duty to clarify the meaning of Thompson’s statement before proceeding with the interrogation. Before Investigator Clemons obtained Thompson’s signature on the Miranda waiver form or asked him any questions *809 concerning Garrett’s death, the following colloquy occurred:
“Clemons: But before I ask you any questions, (unintelligible) there, I’m going to go ahead and read you your Miranda rights, I understand, they’ve already been read to you?
“Thompson: They’ve already done that. Yes, sir, they sure have.
“Clemons: Well, I’m going to read them to you again then.
“Thompson: Okay, not a problem. Not a problem.
“Clemons: Before we ask you any questions, you must understand your rights. Your rights are as follows: You have the right to remain silent. Anything you say can and will be used against you in a court of law. You understand that, right?
“Thompson: Yes, sir. Yes, sir.
“Clemons: Okay. You have the right to talk to a lawyer and to have him present with you while you are being questioned. Do you understand that?
“Thompson: Yes, sir. I sure do.
“Clemons: If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish. You understand that?
“Thompson: Yes. Yes, sir.
“Clemons: You can decide at any time to exercise these rights and not answer any questions or make any statements. You understand that?
“Thompson: Yes, sir.
“Clemons: Okay. Alright, I have, read or have had these rights read to. me of my rights. I understand what my rights are. I am willing to make a statement and answer any questions. I do not want a lawyer present at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. Do you understand that?
“Thompson: I understand that. Can I ask a question?
“Clemons: Sure can.
“Thompson: Um, what are you charging me with?
“Clemons: I’m not. You’re not under arrest.
“Thompson: Okay. I’m just, I mean this is all formality. I understand that right there, but I mean I have nothing to hide. I mean, I’m just here to let you know what happened and that’s it. You know, I mean, you know.
“Clemons: Okay. If you understand that and you’re willing to talk to us, just sign this right there.
“Thompson: Sure. I don’t have a problem with this, sir.”
In that' colloquy, Investigator Clemons made perfectly clear that Thompson could have an attorney present while he was being questioned and that, if he desired an attorney but could not afford to hire one, one would be appointed to represent him before any questioning occurred. Investigator Clemons specifically asked Thompson if he understood those rights, and Thompson unequivocally stated that he understood those rights. Investigator Clemons also gave Thompson the opportunity to ask any questions that he desired to ask before he signed the waiver form. Investigator Clemons’s statements precisely answered Thompson’s earlier inquiry regarding when he could obtain counsel.
In order to clarify whether Thompson fully understood his rights concerning counsel, Investigator Clemons specifically asked Thompson whether he understood the statements concerning those rights and Thompson stated that he understood. Also, Thompson did not ask any more questions concerning those rights when he *810 was given the opportunity to ask questions. Therefore, we conclude that, before Investigator Clemons obtained Thompson’s signature on the Miranda waiver form or asked him any questions concerning Garrett’s death, Investigator Clemons fulfilled his duty to clarify any ambiguity that resulted from Thompson’s earlier equivocal reference to an attorney. Thus, we hold that Thompson knowingly and intelligently waived his Miranda rights and that the trial court did not err in denying his motion to suppress.
Next, Thompson alleges that the trial court erred in denying his motion for a new trial because, he says, the jury’s verdict was against the great weight of the evidence. Thompson does not argue that the State failed to prove a prima facie case of manslaughter against him.
Under § 13A-6-8, Ala.Code 1975, a person commits the crime of manslaughter if “he recklessly causes the death of another person.” Section 13A-2-2, Ala.Code 1975, provides, in relevant part: “A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.”
Initially, we note:
“ ‘The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, “viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.”
“ ‘In contrast, “the ‘weight of the evidence’ refers to a ‘determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.’ ” We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. “ ‘The credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.’ ” ’ ”
Seaton v. State, 645 So.2d 341, 342-43 (Ala.Crim.App.1994), quoting Johnson v. State, 555 So.2d 818, 819-20 (Ala.Crim.App.1989) (citations omitted).
“Once a prima facie case has been submitted to the jury, this Court will not upset the jury’s verdict except in extreme situations in which it is clear from the record that the evidence against the accused was so lacking as to make the verdict wrong and unjust. Deutcsh v. State, 610 So.2d 1212, 1234-35 (Ala.Cr.App.1992). This Court will not substitute itself for the jury in determining the weight and probative force of the evidence. Benton v. State, 536 So.2d 162,165 (Ala.Cr.App.1988).”
May v. State, 710 So.2d 1362, 1372 (Ala.Crim.App.1997).
“Furthermore, on appeal, there is a presumption in favor of the correctness of the jury verdict. Saffold v. State, 494 So.2d 164 (Ala.Cr.App.1986). Although that presumption of correctness is strong, it may be overcome in a limited category of cases where the verdict is found to be palpably wrong or contrary to the great weight of the evidence. Bell v. State, 461 So.2d 855, 865 (Ala.Cr.App.1984).”
Henderson v. State, 584 So.2d 841, 851 (Ala.Crim.App.1988).
In the present case, the jury’s verdict finding Thompson guilty of man *811 slaughter was not palpably wrong or contrary to the great weight of the evidence. It is undisputed that Garrett died from a gunshot wound to her neck and that Thompson had physical contact with her very close to the time that she was shot. Thompson also admitted that he knew that the gun was loaded. Thompson testified that Garrett shot herself. However, the State presented evidence indicating that Thompson’s version of the events was impossible and that a physical altercation occurred between Thompson and Garrett near the time of her death. This case does not present a situation where it is clear from the record that the evidence against Thompson was so lacking as to make the jury’s verdict wrong and unjust. The credibility of the witnesses and the weight and probative force of their testimony was for the jury to determine. We hold that the jury’s verdict was not against the great weight of the evidence; thus, the trial court did not err in denying Thompson’s motion for a new trial.
Finally, Thompson argues that the trial court erred by denying his motion for a judgment of acquittal because, he says, “[t]he State of Alabama failed to prove a prima facie case of murder in that it provided no evidence, direct or circumstantial, that the defendant intentionally caused the death of the alleged victim, Melissa Garrett.” (Thompson’s brief, at 31.) However, Thompson was not convicted of murder.
This Court addressed this same issue in Davenport v. State, 968 So.2d 27 (Ala.Crim.App.2005), stating:
“The appellant further argues that the trial court erroneously denied her motions for a judgment of acquittal at the close of the State’s case and at the close of all of the evidence because the evidence did not support a conviction for murder. However, she was not convicted of murder. Rather, she was convicted of the lesser included offense of manslaughter.
“ ‘ “Only the count upon which appellant was found guilty is subject to appellate review.” DeFries v. State, 597 So.2d 742, 744 (Ala.Crim.App.1992) (quoting Hammond v. State, 354 So.2d 280, 284 (Ala.Crim.App.), cert. quashed, 354 So.2d 294 (Ala.1977), cert. denied 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978)).’
“Snell v. State, 677 So.2d 786, 791 (Ala.Crim.App.1995). Therefore, the appellant’s argument is moot.”
968 So.2d at 32.
Likewise, in the present case, Thompson was convicted of manslaughter, not murder. Because Thompson was not found guilty of murder, that charge is not subject to appellate review. Therefore, Thompson’s argument is moot.
Based on the foregoing, we affirm the judgment of the trial court.
AFFIRMED.
WELCH, P.J., and WINDOM, KELLUM, and JOINER, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).

. Before Investigator Clemons read Thompson his Miranda warnings, Thompson acknowledged that someone had read those warnings to him at some point before the interview. However, Investigator Clemons stated that he wanted to read the warnings to Thompson again, and he did so.