On Application for Rehearing

KELLUM, Judge.
This Court’s opinion issued on February 12, 2016, is withdrawn, and the following is substituted therefor.
The appellant, Eugene Lee Jones, was indicted by a Lauderdale County grand jury for murder, see § 13A-6-2, Ala.Code 1975. Following a trial by jury, Jones was convicted of the lesser-included offense of manslaughter. The circuit court sentenced Jones as a habitual felony offender to life imprisonment and ordered Jones to pay $3,485 in restitution, $50 to the crime victims compensation fund, and court costs.
The evidence presented at trial established the following pertinent facts. On July 25, 2013, Jones and Lula Addison drank and smoked crack together. Begin *950 ning at approximately 9 a.m. and continuing throughout the day, Jones and Addison made numerous purchases at a shop called the “Store and Deli.” Video surveillance showed Jones and Addison buying liquor, beer, Brillo brand scouring pads, and a crack pipe. Around 11:15 a.m., Jones, Addison, her son, and her son’s girlfriend drove to a crack house on Red Bud Street to purchase drugs.
During the morning, Jones checked into room 317 of the City Lodge Hotel in Florence. Addison’s daughter, Lasonia Williams, was working at the hotel as a housekeeper on July 25, 2018. While at the hotel working that day, Williams briefly spoke to Addison before Addison and Jones went into room 317. Williams testified that Addison seemed to be happy and “buzzed” when she spoke to her. (R. 274.) That night, shortly after 8:30 p.m., Addison entered a convenience store, then got into a car with Raphael Glen to return to the crack house to purchase more drugs. Glen then returned Addison to the hotel.
Four days later, on July 29, 2013, Williams was cleaning rooms at the hotel when she “smelled a bad smell” in room 316. (R. 265.) Williams telephoned Peru-late Patel, the hotel owner, who helped Williams investigate the location of the bad smell. Patel and Williams tracked the smell to room 317—the room Addison and Jones had shared. When Patel lifted up the mattress, she discovered a dead body and telephoned the police.
Sgt. Craig Blasingame with the Florence Police Department arrived at the City Lodge Hotel in response to a call for “suspicion of a possible something underneath the hotel bed in Room 317” and what was believed to be a human body. (R. 252.) Sgt. Blasingame lifted the mattress and box springs off of the bed frame and discovered a dead woman. Sgt. Blasingame confirmed that the body under the bed was Addison. The coroner testified that Addison’s body was in a state of decomposition as the body was bloated and layers of skin had begun to separate. Addison’s body was lodged under metal bed rails, one of which was placed across her neck. Sgt. Blasingame testified that there was no sign of a struggle in the hotel room.
During the investigation into Addison’s death, Jones made two statements to law-enforcement officials. On July 29, 2013, Jones went to the district attorney’s office after finding out that he was a suspect in Addison’s death. After waiving his Miranda [1] rights, Jones gave a statement to police. In his first statement, Jones said that he met Addison, bought and smoked some crack cocaine with her, and then rented a room at the City Lodge Hotel with her. Jones told police that he and Addison went to a restaurant to get something to eat before they returned to the hotel room. While they were at the restaurant, Addison ran into a man whom Jones could not identify. Addison told Jones that the man wanted to have sex with her for money and that she wanted to use the hotel room in order to “turn a trick.” (R. 529.) Jones stated that he agreed and left the room. When Jones returned, the door to the room was ajar and Addison was not in the room.
After approximately two hours of questioning, Jones asked for an attorney, stating: “I know where this is going. I need a lawyer. I came here on my own free will.” (R. 216.) Officer Gerald Pearson, who was leading the questioning, immediately stopped questioning Jones about Addison’s murder. Jones was not provided with a lawyer at that time. After Jones invoked his right to counsel and the questioning ended, Officer Pearson offered to give Jones a ride to the Salvation Army shelter *951 facility. However, before Officer Pearson could give Jones a ride, Officer Pearson learned that there was an arrest warrant for Jones from Bessemer stemming from what Officer Pearson believed was a drug-paraphernalia charge. At that point, Jones was taken into police custody and was transferred from Florence to Bessemer. Jones was subsequently released from custody in Bessemer once his case concluded. While in Bessemer, Jones was arrested again on a warrant obtained by Officer Pearson charging Jones with a burglary that occurred in Florence, Jones was subsequently transported back to Florence.
On October 7, 2013, Jones met with Marty Leeth, an agent with the Federal Bureau of Investigation. After waiving his Miranda rights, Jones gave a second statement to law-enforcement officials in which he claimed, as he did in his first statement, that he and Addison had bought and smoked some crack cocaine and had rented a hotel room. Jones, however, stated that when he and Addison returned from the restaurant, they both took off their clothes and got into bed. Suddenly, they heard a knock at the door and Addison jumped up to investigate. When Addison opened the door, a man forced his way into the room and robbed Jones at gunpoint. After the robbery, Addison grabbed her belongings and attempted to leave the room. Jones believed that Addison had set him up to get robbed and tried to lock the door to prevent Addison from leaving the room. According to Jones, he and Addison struggled and he threw Addison on the bed. When Addison “popped right back up,” Jones grabbed her from behind with his left arm around her neck and held her until she stopped moving. (R. 568.) Jones then laid Addison down on the bed after she passed out and discovered that Addison was dead. Jones left the hotel room and walked until daybreak, at which time he returned to the hotel room and put Addison’s body under the bed. Jones then left the hotel and returned again to get his wallet from the room.
Addison’s toxicology report showed the presence of cocaine and levamisole, a drug used to rid animals of parasites. Justin Sanders, a toxicologist with the Alabama Department of Forensic Sciences, testified that levamisole is sometimes used to “cut” crack cocaine. (R. 456.) Based on the toxicology results, Sanders testified that Addison had smoked crack cocaine “cut” with levamisole. According to Sanders, high amounts of levamisole can be lethal. The toxicology report did not indicate how much of the drug was present in Addison’s system. Sanders testified that when cocaine and alcohol are used together, the body generates cocaethylene, a dangerous chemical that can cause sudden death.
Dr. Valerie Green, a medical examiner for the Alabama Department of Forensic Sciences, testified that a toxicology analysis of Addison’s liver revealed a blood-alcohol level of 0.106. Dr. Green stated that the level of alcohol in Addison’s blood meant that she was “somewhat impaired” but that it was not considered a “fatal level of ethanol in the body.” (R. 672.) Dr. Green confirmed the presence of cocaine, cocaethylene and levamisole in Addison’s body but testified that the drugs were not the cause of Addison’s death. According to Dr. Green, Addison’s death was the result of asphyxia due to strangulation. Dr. Green testified that Addison’s trachea was fractured and that the muscles in her neck had hemorrhaged—both signs of strangulation. Dr. Green testified that Addison was alive when she was strangled.
After both sides had rested and the circuit court had instructed the jury on the applicable principles of law, the jury found Jones guilty of the lesser-included offense of manslaughter. Jones timely filed a mo *952 tion for a new trial, which the circuit court denied. This appeal followed.
I.
Jones contends that the circuit court erred by denying his motion for a mistrial made during voir dire. Specifically, Jones contends that statements made by prospective Juror P.H. in the presence of other members of the jury venire “tainted” the jury and ultimately compromised its verdict. (Jones’s brief, p. 23.)
The record indicates that during voir dire the prosecutor asked prospective jurors whether a family member or close friend had ever been the victim of murder or any violent crime. P.H. informed the court that her father “was killed in a car wreck by a young man who decided to do drugs before he drove that morning.” (R. 83.) P.H. informed the court that the defendant pleaded guilty to manslaughter and “received ten years. Two in the prison system, three house arrest with ankle monitor, work privileges, five years probation for a ten year sentence.” (R. 83-84.) When asked if she felt “let down by the court system,” P.H. responded in the affirmative but stated that she thought that she could be fair to both sides. Jones subsequently moved for a mistrial based on P.H.’s response, arguing:
“I’m moving for a mistrial, the reason being is [P.H.], she referred to the charge of manslaughter then proceeded to tell what the punishment was. I think that taints the whole jury. Manslaughter is going to be an option in this case that they can convict him of that, you know, some of these people are going to say well that’s all he can get. Well manslaughter with no priors is two to twenty. With his priors it can be more than that so I feel like it’s going to be unfair for him because now all these people are going to think well we can’t convict him of manslaughter. He’s going to get just a small amount of time and that’s not the case so that’s why I’m moving for a mistrial. You know, a lot of times when we have a jury trial I seen them knock and have the note what the punishment would be. We can’t— they can’t be instructed on that. I feel like they’ve already got some instruction on what punishments could be. I think it’s tainted the venire and any jury that he would get and move for a mistrial.”
(R. 153-54.) P.H. was subsequently struck for cause before trial.
“ ‘A mistrial is a drastic remedy that should be used sparingly and only to prevent manifest injustice.’ Hammonds v. State, 777 So.2d 750, 767 (Ala.Crim.App.1999)(citing Ex parte Thomas, 625 So.2d 1156 (Ala.1993)), aff'd, 777 So.2d 777 (Ala.2000). A mistrial is the appropriate remedy when a fundamental error in a trial vitiates its result. Levett v. State, 593 So.2d 130, 135 (Ala.Crim.App.1991). ‘The decision whether to grant a misted rests within the sound discretion of the trial court and the court’s ruling on a motion for a mistrial will not be overturned absent a manifest abuse of that discretion.’ Peoples v. State, 951 So.2d 755, 762 (Ala.Crim.App.2006).”
Peak v. State, 106 So.3d 906, 915 (Ala. Crim.App.2012).
Further, the Alabama Supreme Court has held that a “mistrial is an extreme measure that should be taken only when the prejudice cannot be eradicated by instructions or other curative actions of the trial court.” Ex parte Lawrence, 776 So.2d 50, 55 (Ala.2000)(citing Nix v. State, 370 So.2d 1115, 1117 (Ala.Crim.App.1979), cert. denied, 370 So.2d 1119 (Ala.1979)).
In the instant case, Jones has not alleged, much less shown, that the venire was tainted with prejudice when P.H. referenced a manslaughter conviction for which the defendant received a 10-year *953 sentence. Instead, Jones speculates, as he did when he moved for a mistrial, that “some of the jurors might have wanted to acquit” and that “some might have wanted to convict [Jones] of criminally negligent homicide.” (Jones’s brief, p. 24.) Furthermore, after the parties finished presenting evidence the circuit court instructed the jury regarding the applicable principles of law. It is presumed that the jury followed the circuit court’s instructions. See Calhoun v. State, 932 So.2d 923, 965 (Ala.Crim.App.2005)(“We presume that the jury follows the circuit court’s instructions.”). Therefore, we cannot say that the circuit court abused its discretion in denying Jones’s motion for a mistrial.
II.
Jones next contends that the circuit court erred by denying his motion to suppress two statements he made to police. Specifically, Jones contends that after he invoked his right to counsel when he gave his first statement to police on July 29, 2013, the State had no right to question him on October 7, 2013, without first providing him an attorney, and that his October 7, 2013, confession to police was the result of coercion and/or deception. Jones relies on Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in support of his contention on appeal.
At the hearing on the motion to suppress, the circuit court considered the following evidence before denying Jones’s motion. On July 29, 2013, police responded to a call after a dead body was found under a bed at the City Lodge Hotel in Florence. The police confirmed that the deceased was Lula Addison. During the investigation into Addison’s death, Jones made two statements to law-enforcement officials. On July 29, 2013, Jones voluntarily went to the district attorney’s office after finding out that he was a suspect in Addison’s death. Officer Pearson learned of Jones’s presence and went to the district attorney’s office to discuss the murder with Jones. After Officer Pearson learned from Jones that Jones had been with Addison shortly before her death, Officer Pearson asked Jones to accompany him to the police department to talk with him about the case. Jones agreed. According to Officer Pearson, Jones was not under arrest at that time. Once at the police station, Jones was advised of, and waived, his Miranda rights. Jones then gave a statement to police. After approximately two hours of questioning, Jones asked for an attorney, stating: “I know where this is going. I need a lawyer. I came here on my own free will.” (R. 216.) As noted earlier, Officer Pearson immediately stopped questioning Jones about Addison’s murder, but Jones was not provided with a lawyer at that time. Officer Pearson offered to give Jones a ride to the Salvation Army shelter facility, but, before he could give Jones a ride, Officer Pearson learned that there was an outstanding arrest warrant for Jones from Bessemer. Jones was taken into police custody and was transferred from Florence to Bessemer. Jones was subsequently released from custody in Bessemer once his case concluded but was arrested again in Bessemer on a warrant obtained by Officer Pearson charging Jones with a burglary that occurred in Florence. Jones was then transported back to Florence.
On October 7, 2013, Marty Leeth, a special agent with the Federal Bureau of Investigation and a polygraph examiner, was contacted by the Florence Police Department to administer a polygraph test to a suspect in Addison’s murder investigation, i,e., Jones. Jones was in police custody at the time. Jones was again advised of, and waived, his Miranda rights. Leeth told Jones that he had been asked to conduct a polygraph test to determine Jones’s involvement with Addison’s death. Jones informed Leeth that Jones did not have a *954 lawyer but that his sister had told him that a lawyer had told her :to tell Jones not to submit to a polygraph test. Leeth agreed that Jones did not have to submit to a polygraph test, but Leeth informed Jones that they would continue in the form of an interview, and, according to Leeth, Jones agreed to be interviewed. Leeth testified that the beginning of the interview concerned Jones’s life history, but toward the end of the interview Leeth asked questions regarding Addison’s death. Jones was asked if he had anything to do with Addison’s death, and Jones said that he did not. Leeth then told Jones:
“If that’s the case you shouldn’t have any problem taking a polygraph examination or passing the polygraph examination if that’s what happened, and I said so would you be willing to take a polygraph examination regarding just— just going to keep it simple to those questions. He sort of threw up his hands and said something to the effect, ‘Screw it. Yeah, I’ll take it’.”
(R. 188.) Leeth asked Jones during the polygraph test if Jones killed Addison and placed her body under the bed in the hotel room. Jones “failed” the polygraph test because it was determined that he had not answered one or more of the test questions truthfully. Jones subsequently admitted during a “post test interview interrogation” that he lulled Addison." (R. 192.)
“This Court reviews de novo a circuit court’s decision on a motion to suppress evidence when the facts are not in dispute. See State v. Hill, 690 So.2d 1201, 1203 (Ala.1996); State v. Otwell, 733 So.2d 960, 962 (Ala.Crim.App.1999).” State v. Skaggs, 903 So.2d 180, 181 (Ala.Crim.App.2004). In the instant case, the facts are uncontested; the only "issue is the circuit court’s application of the law to those facts. Therefore, this Court affords no presumption in favor of the circuit court’s ruling.
“As our Supreme Court has stated:
“ ‘The Fifth Amendment to the United States Constitution provides that, “[n]o person ... shall be compelled in any criminal case to be a witness against himself.” U.S. Const. Amend. V. In Miranda, the United States Supreme Court held that the right against self-incrimination “is fully applicable during a period of custodial interrogation.” 384 U.S. at 460. The Supreme Court in Miranda further held that “the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege.,.. ” 384 U.S. at 469. Before a custodial interrogation, a suspect must be informed of these rights, now commonly referred to as Miranda rights. 384 U.S. at 444 (“Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.”). The Supreme Court in Miranda recognized that “the defendant may waive effectuation of these rights, provided that the waiver is made voluntarily, knowingly, and intelligently.” Id:
“Ex parte Landrum, 57 So.3d 77, 81 (Ala.2010).”
Thompson v. State, 97 So.3d 800, 805 (Ala.Crim.App.2011).
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Edwards was arrested on charges of robbery, burglary, and murder. After Edwards was read his Miranda rights and waived them, Edwards told the interrogating officer that he was willing to answer questions and that he wanted to “make a deal.” Later during questioning, Edwards stated that he wanted to speak to an attorney; the officer stopped questioning Ed *955 wards, and he was taken to the county jail. The following day, however, two detectives came to the jail and asked to speak with Edwards. Edwards initially refused to talk to the detectives but was told by a guard at the jail that he “had” to talk to the detectives. The detectives informed Edwards of his Miranda rights, and Edwards agreed to talk to the detectives. Edwards subsequently incriminated himself during the interrogation and was later convicted on all charges.
The United State Supreme Court in Edwards held:
“ ‘ “[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.”
“ ‘451 U.S. at 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 878 (footnote omitted). The purpose of this rule is to protect an accused in police custody from “‘badger[ing]’ or ‘overreaching’—explicit or subtle, deliberate or unintentional— [that] might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel’s assistance.” Smith v. Illinois, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), quoting Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
“ ‘ “This ‘rigid’ prophylactic rule, Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, e,g., Edwards v. Arizona, supra, 451 U.S. [477], at 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 [ (1981) ] (whether accused ‘expressed his desire’ for, or ‘clearly asserted’ his right to, the assistance of counsel); Miranda v. Arizona, 384 U.S. [436], at 444-445, 86 S.Ct. 1602, 16 L.Ed.2d 694 [ (1966) ](whether accused ‘indicate[d] in any manner and at any stage of the process that he wish[ed] to consult -with an attorney before speaking’). Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. Edwards v. Arizona, supra, [451 U.S.] at 485, 486, n. 9.”
“ ‘Smith v. Illinois, 469 U.S. at 95, 105 S.Ct. 490, 83 L.Ed.2d 488.’ ”
Phillips v. State, 65 So.3d 971, 1020 (Ala.Crim.App.2010).
In Maryland v. Shatzer, 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), the United States Supreme Court narrowed its holding in Edwards. In Shatzer, the defendant, who was incarcerated on a prior conviction, invoked his Miranda right to counsel when questioned about a new allegation of child sexual abuse. The interview was terminated, and Shatzer was released back into the general prison population. Two and a half years later, another detective reopened the case and questioned Shatzer, who was still incarcerated, about the same allegation for which he had previously invoked his right to counsel. 559 U.S. at 101. However, this time Shat-zer waived his Miranda rights and agreed to submit to a polygraph examination. 559 U.S. at at 102. After he failed the polygraph examination, Shatzer gave inculpa- *956 tory statements and was found guilty-based, in part, on those inculpatory statements. 559 U.S. at 102. Shatzer’s conviction was subsequently overturned on the basis that Shatzer was not afforded the protections provided for in Edwards. 559 U.S. at 103.
In reversing the lower court’s ruling, the United States Supreme Court held that after a 14-day break in custody the police may ask an accused to waive his Miranda right to counsel even though he has previously invoked his right to counsel while in custody. 559 U.S. at 111. In so holding, the Court reasoned:
“The protections offered by Miranda, which we have deemed sufficient to ensure that the police respect the suspect’s desire to have an attorney present the first time police interrogate him, adequately ensure that result when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate the coercive effects.”
Shatzer, 559 U.S. at 109.
Additionally, the Court held in Shatzer that lawful imprisonment imposed upon the conviction of a crime does not create the coercive pressures identified in Miranda, and therefore it does not constitute custody for Miranda purposes. 559 U.S. at 112-13.
In this case, Jones invoked his Miranda right to counsel on July 29, 2013, when Officer Pearson questioned him regarding Addison’s murder. Once Jones invoked his right to counsel, Officer Pearson immediately stopped questioning Jones. Jones was subsequently arrested for charges unrelated to Addison’s murder. Approximately two months later, while Jones was in custody on a burglaxy charge Leeth interviewed Jones regarding Addison’s murder and asked Jones to submit to a polygraph examination. Jones waived his Miranda rights at that time, submitted to a polygraph examination, failed the polygraph examination, and subsequently made inculpatory statements.
The circumstances of Jones’s invocation of his Miranda right to counsel and the subsequent interview by Leeth do not implicate the same concerns of the defendant in Edwards. The protections in Edwards were designed to “prevent police from badgering a defendant into waiving his previously asserted Miranda rights.” McNeil v. Wisconsin, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). In October 2013, when Jones was questioned a second time about Addison’s death, Jones had been out of custody for Miranda purposes more than 14 days. Therefore, there was no presumption of involuntariness under Edwards when Jones was questioned by Leeth in October 2013. Because Jones was given Miranda warnings and because he waived his Miranda rights before giving his October 2013 statement to Leeth, Jones’s inculpa-tory statements were admissible. Therefore, the circuit court did not abuse its discretion in denying Jones’s motion to suppress.
III.
Jones also contends that the circuit court erred by denying his motion for a new trial because, he argues, the State did not prove that he acted recklessly and “his conviction for manslaughter was not supported by the evidence.” (Jones’s brief, p. 33.) Jones contends that the evidence demonstrates that his conviction was the result of a “compromised verdict.”[2] (Jones’s brief, p. 41.)
*957 “The granting or denying of a motion for new trial rests largely within the discretion of the trial court, and the exercise of that discretion carries with it a presumption of correctness that will not be disturbed on appeal unless some legal right was abused and the record plainly and palpably shows that the trial court was in error.”
Knight v. State, 710 So.2d 511, 513 (Ala.Crim.App.1997)(quoting Beard v. State, 661 So.2d 789, 796 (Ala.Crim.App.1995) (citations omitted)).
To the extent that Jones challenges the weight of the evidence, this Court has held:
““‘The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, ‘viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.’
“ ‘ “In contrast, ‘the “weight of the evidence” refers to a “determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.” ’ We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. ‘ “The credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.” ’ ” ’
“Seaton v. State, 645 So.2d 341, 342-43 (Ala.Crim.App.1994), quoting Johnson v. State, 555 So.2d 818, 819-20 (Ala.Crim.App.1989) (citations omitted).
“ ‘Once a prima facie case has been submitted to the jury, this Court will not upset the jury’s verdict except in extreme situations in which it is clear from the record that the evidence against the accused was so lacking as to make the verdict wrong and unjust. Deutcsh v. State, 610 So.2d 1212, 1234-35 (Ala.Crim.App.1992). This Court will not substitute itself for the jury in determining the weight and probative force of the evidence. Benton v. State, 536 So.2d 162, 165 (Ala.Crim.App.1988).’
“May v. State, 710 So.2d 1362, 1372 (Ala.Crim.App.1997).
“ ‘Furthermore, on appeal, there is a presumption in favor of the correctness of the jury verdict. Saffold v. State, 494 So.2d 164 (Ala.Crim.App.1986). Although that presumption of correctness is strong, it may be overcome in a limited category of cases where the verdict is found to be palpably wrong or contrary to the great weight of the evidence. Bell v. State, 461 So.2d 855, 865 (Ala.Crim.App.1984).’
“Henderson v. State, 584 So.2d 841, 851 (Ala.Crim.App.1988).”
Thompson v. State, 97 So.3d 800, 810 (Ala.Crim.App.2011).
A person commits the crime of reckless manslaughter if “[h]e recklessly causes the death of another person.” § 13A-6-3(a)(1), Ala.Code 1975. “A person acts recklessly with respect to a result or to a circumstance ... when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists.” § 13A-2-2(3), Ala.Code 1975. The Alabama Supreme Court has defined the “recklessness” required for manslaughter as follows: “[A] reckless defendant is one who has ‘consciously disregarded’ a substantial and unjustifiable risk.” Ex parte Koppersmith, 701 So.2d 821, 822 (Ala.1997)(quoting Ex parte Weems, 463 So.2d 170, 172 (Ala.1984)).
Contrary to Jones’s contention on appeal, the State presented evidence that *958 Jones acted recklessly when he grabbed Addison from behind and put his left arm around her neck and held her until she stopped moving. Medical evidence presented at trial indicated that Addison’s trachea was fractured and that the muscles in her neck had hemorrhaged—both signs of strangulation. Dr. Green testified that Addison’s death was a result of asphyxia by strangulation. Although there was evidence indicating that Addison had engaged in risky behaviors immediately before her death, i.e., the consumption of alcohol and crack cocaine, the State presented evidence indicating that Jones’s actions caused Addison’s death. It was for the jury, as the trier of fact, to make a determination regarding the conflicting evidence. See Thompson, supra. Given the evidence presented at trial, the circuit court did not err in denying Jones’s motion for a new trial.
IV.
Jones also contends that the circuit court erred by denying his motion for a judgment of acquittal because, he argues, the State did not present a prima facie case for murder. We need not address this contention, however, because Jones challenges the sufficiency of the State’s evidence against him for murder— a charge of which he was acquitted.
“ ‘[Generally, a conviction for a lesser-included offense is an implied acquittal of a greater offense.’ Ex parte Gillentine, 945 So.2d [1091,] 1093 [ (Ala.Crim.App.2006) ] (emphasis added). Accord Green v. United States, 355 U.S. 184, 189-91, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). In Bradley v. State, 925 So.2d 232, 237 (Ala.2005), this Court held that a conviction for a lesser offense was an explicit acquittal of the greater offense, because the trial court in that case had instructed the jury that it could consider the lesser offense ‘only if it found that the State had failed to prove all of the elements of [the greater offense].’ ”
Ex parte Gillentine, 980 So.2d 966, 968 (Ala.2007).
Because Jones was convicted of the lesser-included offense of manslaughter, his challenge to the sufficiency of the State’s evidence to prove murder is moot. Cf. Snell v. State, 677 So.2d 786, 791 (Ala.Crim.App.1995)(holding that, because Snell was not convicted of enticement, his challenge to the sufficiency of the evidence to support such a charge was moot).
V.
Jones next contends that the circuit court erred by admitting Dr. Green’s autopsy report into evidence over Jones’s objection. Specifically, Jones contends that the autopsy report included a toxicology report that Dr. Green did not perform, that was not properly authenticated, and that was not properly admitted into evidence at trial. Jones relies solely on this Court’s holding in Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006), in support of his contention on appeal.
In Lewis, defense counsel questioned the medical examiner who had performed an autopsy of the victim regarding whether she had requested a blood-alcohol analysis. After learning that a blood-alcohol analysis had been requested, defense counsel attempted to have the contents of the toxicology report admitted as a business record, but the trial court sustained the prosecutor’s hearsay objection. On appeal, Lewis argued that the circuit court erred in refusing to allow the toxicology report into evidence and that the report should have been admitted into evidence under either the business-record exception or the public-record exception to the hearsay rule. Lewis, 24 So.3d at 509. This Court disagreed, however, holding that the circuit court had properly excluded the *959 report because Lewis failed to meet the foundational requirements of Rule 803(6), Ala. R. Evid., required to authenticate the report as a business record. Lewis, 24 So.3d at 510.
Jones’s reliance on Lems is misplaced. In this case, Justin Sanders, a toxicologist with the Alabama Department of Forensic Sciences, testified at length regarding the toxicology report. The State subsequently moved to admit the toxicology report into evidence, and the report was admitted into evidence without objection. Dr. Green then testified regarding her autopsy report that, she explained, included a report of autopsy and a toxicology report of the victim. Dr. Green testified that these two documents were needed for a “complete report of autopsy.” (R. 661.) When Jones objected to the admission of the toxicology analysis with the autopsy report, the circuit court noted that the toxicology report had already been admitted into evidence.
Even if we were to conclude that the circuit court erred by admitting Dr. Green’s autopsy report that included the toxicology report into evidence at trial, we would not find reversible error, given that the toxicology report had already been admitted into evidence. See generally Simmons v. State, 797 So.2d 1134, 1158 (Ala.Crim.App.1999), cert. denied, 797 So.2d 1186 (Ala.2001)(holding evidence consisting of expert testimony admissible where evidence was merely cumulative of other evidence presented at trial). In this case, the toxicology report attached to Dr. Green’s autopsy report was admitted into evidence without objection before Dr. Green testified at trial. Thus, admission of a second copy of the toxicology report would have been harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly, Jones is not entitled to a reversal of his conviction on the basis of this issue.
VI.
Jones also contends that the circuit court erred when it overruled his objection to the circuit court’s jury instruction on intent because, he argues, the instruction was misleading and confusing, and it “created a mandatory presumption with the jury that shifted the burden of proof to [Jones] in violation of his right to a fair trial.” (Jones’s brief, p. 46.) Specifically, Jones challenges the circuit court’s intent instruction on the lesser-included offense of assault in the third degree. In charging the jury on third-degree assault, the circuit court stated, in pertinent part:
“If you find from the evidence that the State has proved beyond a reasonable doubt each of the elements of the offense of assault in the third degree, then you shall find the defendant guilty of assault in the third degree. If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of assault in the third degree, then you cannot find the defendant guilty of assault in the third degree. Intoxication is not a defense to a criminal charge; however, intoxication whether voluntary or involuntary is admissible in evidence whenever it is relevant to negate an element of an offense charged. Evidence to prove intent need not be direct but may be circumstantial because the element of intent being a state of mind or mental purpose is usually incapable of direct proof. It may be inferred from the character of the assault and other attendant circumstances. A killing is not accidental when the act causing death is intentional.”
(R. 901-02.)(Emphasis added.)
Jones contends on appeal, as he did below, that the circuit court’s instruction that “[a] killing is not accidental when the act causing death is intentional” *960 was misleading and confusing to the jury. ‘“A trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case.’ ” Toles v. State, 854 So.2d 1171, 1175 (Ala.Crim.App.2002)(quoting Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App.1986)).
“When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’” Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001). The trial court may refuse to give a requested jury charge when the charge is either fairly and substantially covered by the trial court’s oral charge or is confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law. See Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Crim.App.1995); see also Ex parte Wilhite, 485 So.2d 787 (Ala.1986).
The circuit court’s instruction with regard to whether intoxication could negate intent in this case was correct; it was not misleading, confusing, or inadequate. See Benton v. State, 536 So.2d 162, 164 (Ala.Crim.App.l988)(recognizing that “[a] killing is not accidental when the act causing death is done intentionally” in case where evidence showed that defendant, by his own admission, grabbed his girlfriend’s neck, although he asked jury to believe that he accidentally strangled his girlfriend). We can find no error with the circuit court’s instructions. Therefore, Jones is entitled to no relief as to this issue.
VIL
Finally, Jones contends that the circuit court erred by not giving a jury charge on assault in the first degree as a lesser-included offense of murder. Specifically, Jones contends that a charge on first-degree assault was warranted because “even though a weapon was not used there was evidence for the sake of this argument that could be said to support a theory that [Jones] sought to seriously disfigure the victim or damage the organ of the victim’s body mainly the trachea.” (Jones’s brief, p. 49.)
At the outset, we question whether this issue is preserved for review on appeal. The record indicates that the circuit court conducted a lengthy charge conference at which the court, defense counsel, and the prosecutor discussed the lesser-included offenses on which the jury was to be instructed. The circuit court ruled that it would instruct the jury on the following offenses: murder, reckless manslaughter, criminally negligent homicide, assault in the second degree, and assault in the third degree. At the charge conference, Jones objected to the circuit court’s failure to give a lesser-included instruction on heat-of-passion manslaughter but did not object to the circuit court’s failure to give an instruction on first-degree assault. After the circuit court instructed the jury, Jones renewed his objection to the circuit court’s failure to give an instouction on heat-of-passion manslaughter but made no mention of the circuit court’s failure to instruct on first-degree assault.
“ ‘Review on appeal is restricted to questions and issues properly and timely raised at trial.’” Ex parte Coulliette, 857 So.2d 793, 794 (Ala.2003)(citing Newsome v. State, 570 So.2d 703, 717 (Ala.Crim.App.1989)). “‘An issue raised for the first time on appeal is not subject to *961 appellate review because it has not been properly preserved and presented.’ ” Id. at 794 (citing Pate v. State, 601 So.2d 210, 213 (Ala.Crim.App.1992)). “[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.” McKinney v. State, 654 So.2d 95, 99 (Ala.Crim.App.1995) (citation omitted).
Rule 21.3, Ala. R.Crim. P., provides, in pertinent part:
“No party may assign as error the court’s giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection.”
In order to preserve an issue regarding jury instructions for appellate review, the defendant must object before the jury retires to deliberate. See Davis v. State, 747 So.2d 921, 924 (Ala.Crim.App.1999); Hinton v. State, 632 So.2d 1345, 1350 (Ala.Crim.App.1993). Because Jones did not object to the circuit court’s failure to instruct the jury on first-degree assault, this issue is not properly preserved for our review. See Coulliette, supra.
In any event, Jones was not entitled to an instruction on assault in the first degree based on the evidence presented at trial. A person commits the crime of assault in the first degree if, “[w]ith intent to cause serious physical injury to another person, he causes serious physical injury to any person by means of a deadly weapon or a dangerous instrument.” § 13A-6-20, Ala. Code 1975. The evidence presented at trial did not demonstrate that Jones caused serious physical injury to Addision by means of a deadly weapon or a dangerous instrument. At most, the evidence indicated that Jones grabbed Addison from behind with his left arm around her neck until Addison stopped moving and that Jones’s actions caused Addison’s death. Accordingly, Jones is not entitled to relief on this claim.
Based on the foregoing, the judgment of the circuit court is affirmed.
APPLICATION FOR REHEARING GRANTED; OPINION OF FEBRUARY 12, 2016, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
WINDOM, P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. For the purposes of review, we have combined issues III and IV addressed in Jones's brief on appeal.